**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x        04 CV 1382 (NG) (MDG)
**TASKER SPRUILL,**

              **Petitioner,**

  - against -        **OPINION AND ORDER**

**WILLIAM E. PHILLIPS,**

              **Respondent.**
-------------------------------------------------------x

**GERSHON, United States District Judge:**

Petitioner Tasker Spruill, through his counsel, applies to this court under 28 U.S.C. § 2254 for a writ of habeas corpus, alleging that he is being held in custody in violation of the Constitution and laws of the United States pursuant to the judgment of a court of the State of New York. For the reasons set forth below, petitioner's application is denied.

**PROCEDURAL HISTORY**

On October 22, 1993, Tracey Thomas was shot and killed while sitting in a parked car in Brooklyn. In connection with this crime, petitioner was convicted of intentional murder in the second degree, N.Y. Penal Law § 125.25[1], following a jury trial in New York Supreme Court, Kings County (Belen, J.). Petitioner was sentenced on September 16, 1998 to a term of imprisonment of twenty-five years to life.

On direct appeal to the Appellate Division, Second Department, petitioner raised two claims through his appellate counsel: (1) petitioner's constitutional right to a fair trial was violated by the prosecutor's improper comments during summation, and (2) petitioner's constitutional right to a fair

1

trial was violated by the wrongful admission of two items of consciousness of guilt evidence. Petitioner raised additional claims in a *pro se* supplemental brief. By order dated November 4, 2002, the Appellate Division affirmed petitioner's conviction, over the dissent of one justice. *People v. Spruill*, 299 A.D.2d 374 (2d Dep't 2002). The court held that the trial court "providently exercised its discretion" in admitting both items of consciousness of guilt evidence. *Id*. at 375. The court also held that, although certain comments made by the prosecutor during summation were improper, "that error does not warrant reversal." *Id*. The court found petitioner's remaining claims to be without merit. *Id*. The dissenting justice found that neither item of consciousness of guilt evidence should have been admitted, and that the errors were compounded by the prosecutor's arguments during summation. *Id*. at 376-77. "In view of the quality of the evidence adduced against the defendant," the justice concluded, "the errors cannot be deemed harmless." *Id*. at 377. Petitioner's application for leave to appeal to the New York Court of Appeals was denied on January 13, 2003.

Petitioner filed the instant application for a writ of habeas corpus on April 12, 2004. In it, he raises only one claim: that his constitutional right to a fair trial was violated by the wrongful admission of the consciousness of guilt evidence.

## FACTS

At trial, the prosecution called two eyewitnesses to the shooting. Marilyn Connor testified that she was present at the scene of the crime, and that she was familiar with both the victim and the petitioner "from the neighborhood." Tr. at 127, 131. According to Connor, Thomas, the victim, was a drug dealer. At the time of the shooting, Thomas was sitting in his car, a black Saab, which was parked. From a distance of about five feet, Connor saw petitioner standing in front of the car

and heard a shot. She then fled the scene. Connor admitted to being a heroin addict, to having been arrested multiple times for shoplifting and prostitution, and to having lied to an assistant district attorney during an interview while under oath. During cross-examination, she invoked her Fifth Amendment privilege against self-incrimination, and was granted use immunity with respect to her participation in drug dealings in exchange for her further testimony.

Shawn Newton a/k/a Derrick Wright also testified as an eyewitness to the shooting. Newton said that he had known both Thomas and petitioner since childhood. He also identified Thomas as a drug dealer, and testified that petitioner, who was known by the nickname "Pike," owned a game room in Brooklyn. According to Newton, on the night of the shooting, Thomas, Newton, and a third man named Greg Pearson were driving around in Thomas's car, a black Saab. They stopped near petitioner's game room, where a crowd of people they knew were gathered on the street, and began to socialize. Thomas remained inside the car; Newton and Pearson got out. At some point, petitioner's brother Marty, who was standing in front of the game room, motioned for Thomas to come and talk to him. By this time, Newton and Pearson had returned to the car. Thomas retrieved a gun that was hidden in the car and put it in his lap. He then drove over to where Marty was standing and parked the car. Marty approached the car on the driver's side and shook Thomas's hand through the window, which was rolled all the way down. He began making small talk with Thomas, but never let go of his hand. A few minutes later, petitioner came out from the game room with another gun and approached the car. Reaching around his brother, petitioner "put the gun in Tracey's chest, and he shot him one time." Tr. at 497. Thomas immediately put the car in gear and drove around the corner, at which point he lost control of the car and crashed into a parked car. Newton and Pearson climbed out of the car's back window and fled.

3

Newton admitted to being a daily marijuana smoker since the age of five, and to having smoked "a lot" of marijuana on the day of the shooting. Tr. at 485. He also admitted to being a drug dealer and acknowledged that, at the time of his testimony, he was incarcerated for selling drugs. In exchange for his testimony, Newton asked the prosecutor for the following benefits: that he be transferred to a different corrections facility; that he be placed on work release; that he receive parole at his earliest eligibility; that he be removed from solitary confinement, where he was placed after engaging in lewd conduct in a public area of the prison; and that his family be relocated. The prosecutor agreed to request these benefits for Newton, but indicated that he could not guarantee them because they involved matters beyond his control.

Following a hearing outside the presence of the jury, Newton was permitted to testify on redirect that, while being held at Rikers Island prior to petitioner's trial, he was confronted by another inmate who called him a snitch. The other inmate brandished a document, which Newton believed to be the minutes of his Grand Jury testimony.[1]

    Q.    Did someone approach you?

    A.    Yes.

    Q.    Did you know who this person was?

    A.    No.

    Q.    Do you know his name as you sit here today?

    A.    No, I don't recall his name.

---

[1] It is unlikely that the document actually could have been the minutes of Newton's Grand Jury testimony because, at the time that the exchange at Riker's Island allegedly took place, unredacted minutes of Newton's testimony, bearing his name, had not been released to anyone by the prosecutor.

4

Q. Did he show you something?

A. Yes.

Q. Could you tell the members of the jury what he showed you?

A. He showed me some statements that I had supposedly had made at the Grand Jury.

Q. Statements that who had made?

A. Me.

Q. And when he showed you the statements that you had made, had you given him those statements?

A. Nah.

Q. Did he say anything to you?

A. Yes.

Q. What was that?

    [DEFENSE COUNSEL]: Objection, your Honor.

    THE COURT: Overruled.

A. He said I was a snitch. We was like arguing. I'm saying about defendant, we was arguing about the defendant.

    [DEFENSE COUNSEL]: Objection, your Honor.

    THE COURT: Overruled.

A. He was like, yo, you is a snitch. I said everybody in the house is snitching on my house. I'm telling him I don't care about his man. His man did something to my friend so I don't care about his man.

Q. You actually saw the papers that he had?

A. Yeah.

> Q. And those papers, did they relate to your testimony in this case?
>
> A. Yes.
>
> Q. Did you receive– keep those papers from him?
>
> A. He kept from me.
>
> Q. I'm sorry?
>
> A. He kept them from me. He showed me, tried to make himself look big.
>
> > [DEFENSE COUNSEL]: Objection, your Honor.
> >
> > THE COURT: He showed you to what?
> >
> > THE WITNESS: Make himself look big.
> >
> > THE COURT: Overruled. I'll allow that.
>
> Q. Did he give you a copy of the papers?
>
> A. No, sir.

Tr. at 694-96. Newton interpreted the incident as a threat. On cross-examination, he acknowledged that he had volunteered to other inmates, both upstate and at Rikers Island, that he intended to testify as a witness against petitioner.

The prosecution also called Morris Rogers a/k/a Big Ray to testify. Rogers, a friend of Thomas, was present at the scene of the crime but did not witness the shooting. He did see the subsequent car crash and attempted to assist Thomas. When the police arrived at the scene, they found Rogers removing money from Thomas's car. Rogers was detained and questioned in connection with the shooting, but was eventually released.

The prosecution's other witnesses included two police officers who responded to the crime scene, several New York detectives who worked on the case, a detective from Baltimore, Maryland,

6

a ballistics expert, and a medical examiner. Collectively, the testimony of these witnesses established that, despite extensive search efforts, the police were not able to locate petitioner for four years following the shooting. He was finally apprehended in 1997 in Baltimore, Maryland, at which time he told the police that his name was Kevin Michael Mulberry. Thomas's cause of death was a gunshot wound to the chest. A gun recovered from Thomas's car by the police was not the murder weapon; the gun used to shoot Thomas was never recovered.

The parties stipulated that petitioner "at one time had a small tattoo on the outside bicep area of his left arm. The tattoo said, 'Pike.'" After the stipulation was read into the record, petitioner displayed his left arm for the jury. On it, there was a tattoo of a panther surrounded by moneybags. The tattoo did not contain any lettering. In addition, a redacted copy of the death certificate of Gregory Pearson, who had been killed prior to trial, was admitted into evidence.

The defense called two witnesses at trial, both of whom were detectives who interviewed Marilyn Connor in 1993. At the time of Ms. Connor's interview, Morris Rogers was still a suspect, and the detectives showed her a photo array containing Rogers's picture. Although a report filed by one of the detectives states that Connor did not identify anyone in the photo array as the shooter, a handwritten notation on the back of the picture of Rogers indicates a positive identification by Connor. Neither detective had an independent recollection of the interview with Connor. The prosecution recalled Connor in rebuttal. She testified that she never identified Morris Rogers as the shooter.

During summation, the prosecutor argued that both the implied threat made to Newton at Rikers Island and the alteration of petitioner's tattoo demonstrated consciousness of guilt on the part of petitioner. The prosecutor also argued that Newton's willingness to testify in spite of the threat

7

made to him bolsters his credibility: "Do you think that Derrick Wright [Newton], after he saw that Grand Jury testimony at Rikers, wanted to be here, other than the fact that he wanted to tell you about what happened to his friend?" Tr. at 1138. Defense counsel did not make any arguments concerning the threat or the tattoo during summation.

    The court gave the following charge with respect to consciousness of guilt evidence:

> In this case, the People have introduced evidence of certain behavior and conduct by the defendant from which the People contend that you, the jury, draw an inference that such conduct evidence is a consciousness of guilt.
>
> The evidence upon which the People rely is as follows:
>
> The People contend that the defendant's flight from Brooklyn soon after Tracey Thomas was killed, and for four years thereafter; the defendant's alleged use of a false name when apprehended by the Baltimore police in August 1997; the alleged threats made to Shawn Newton while in Rikers Island concerning his testifying against the defendant; and the alleged attempt by this defendant to alter his appearance by removing the "Pike" tattoo from his arm are all evidence of the consciousness of guilt.
>
> Whether or not the evidence I have mentioned does in fact evidence a guilty mind on the part of the defendant and, if so, what weight should be given to such evidence is exclusively a jury question. Under some limited circumstances proof of such conduct may be considered by the jury.
>
> I instruct you now under what circumstances you may consider such conduct.
>
> Your first duty is to decide whether evidence of defendant's conduct upon which the People rely if believed by you does in fact evidence a consciousness of guilt on the part of the defendant. You must examine such evidence carefully. Such conduct may have an innocent explanation. If you find such an explanation from the nature of the conduct itself, you must disregard such evidence totally, forget you heard it. For example, common experience teaches that even an innocent person who finds himself placed under suspicion may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or prosecution.
>
> Thus, if an innocent purpose may be drawn from the evidence you must disregard it completely. Only if you find that the conduct of the defendant was solely

motivated by consciousness of guilt may you consider it and weigh it in your deliberations.

I instruct you that proof of conduct evidencing consciousness of guilt has slight value. Standing alone such evidence may never be the basis for a finding of guilt. However, when the People have introduced other direct and substantial evidence pointing toward the guilt of the defendant, then evidence of alleged flight, alleged resort to a false identity by use of an alias when apprehended, evidence of alleged threat to a witness and evidence of intent to conceal identity by removing tattoo from an arm may be considered by you together in considering other direct evidence of guilt in arriving at your verdict.

Tr. at 1164-66.

## DISCUSSION

### I. Standard of Review

Since this petition for a writ of habeas corpus was filed after April 24, 1996, it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996). AEDPA mandates deference to state court decisions by federal courts conducting habeas corpus review. Under its provisions, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The habeas court must presume that the state court's determination of factual issues is correct unless the petitioner demonstrates otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has held that a state court decision is "contrary to" clearly established Supreme Court precedent if it "contradicts the governing law set forth in [Supreme Court] cases or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The Court has further held that a state court decision is "an unreasonable application of" clearly established Supreme Court precedent if, from an objective standpoint, the state court applied Supreme Court precedent unreasonably, not simply incorrectly or erroneously. *Id*. at 411. The Court of Appeals for the Second Circuit has clarified this standard, holding that "[although] some increment of incorrectness beyond error is required ... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Sellen v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

## II. Admission of the Consciousness of Guilt Evidence

Federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). It is not the province of a federal habeas court to reexamine state court determinations on state law questions. *Id.* at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* at 68.

The introduction of improper evidence against a defendant does not amount to a constitutional violation unless the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice" guaranteed by the Due Process Clause of the Fourteenth

Amendment. *Dunnigan v. Keane*, 137 F.3d 117, 125 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). To meet this standard, the improperly admitted evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. *Id*. In assessing materiality, a court must review the improperly admitted evidence in light of the entire record before the jury. *Id*.

### A. The Threat

Petitioner argues that Newton's testimony concerning the implied threat made to him at Rikers Island was admitted improperly because no competent evidence linked petitioner to the threat. The Appellate Division found that "[t]he witness' testimony of his conversation with the fellow inmate circumstantially connected the defendant to the threat." 299 A.D.2d at 375. Whether or not the Appellate Division was correct in its conclusion, the admission of the threat evidence does not entitle petitioner to habeas corpus relief.

Drawing on the findings made by the dissenting justice in the Appellate Division concerning the quality of the evidence against petitioner at trial, petitioner contends that the case against him was so weak that, but for the admission of the challenged consciousness of guilt evidence, he would have been acquitted. The court does not agree. Two eyewitnesses identified petitioner as the shooter. Petitioner correctly points out that both witnesses had lengthy criminal records, but this fact is not fatal to the witnesses's credibility. Both witnesses testified about their records, as well as about the benefits they hoped to receive as a result of their testimony, and were thoroughly cross-examined on these topics. Notably, the witnesses did not know each other; their identifications were independent and corroborative of one another. Moreover, the unchallenged consciousness of guilt

11

evidence– that defendant fled New York following the crime, abandoning his game room business and evading apprehension by the police for four years, and that, when eventually apprehended in Baltimore, petitioner gave a false name to police– is powerful in itself and renders the challenged consciousness of guilt evidence cumulative. In light of all of the evidence presented to the jury in this case, the testimony concerning the threat was not sufficiently material to provide the basis for petitioner's conviction, nor to remove a reasonable doubt that would have existed on the record without it. Indeed, if the jury found Newton's testimony concerning the threat credible, then it likely also found credible Newton's testimony that he witnessed petitioner shoot Thomas. Furthermore, the impact of the testimony concerning the threat was mitigated by the court's instructions to the jury that "even an innocent person who finds himself placed under suspicion may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or prosecution" and that "proof of conduct evidencing consciousness of guilt has slight value." Accordingly, the decision of the Appellate Division with respect to the testimony concerning the threat was neither contrary to, nor an unreasonable application of, clearly established federal law.

### B.     The Tattoo

Petitioner argues that the admission of evidence concerning the alteration of his tattoo was improper because no competent evidence established that the alteration occurred after the shooting. Again, petitioner's argument, even if correct under New York law, fails to state a constitutional claim. The alteration of petitioner's tattoo, in itself, could not have been dispositive of the jury's verdict. In light of the other evidence introduced by the prosecution, including the unchallenged

consciousness of guilt evidence, and the court's instructions with respect to the consciousness of guilt evidence, the admission of the evidence concerning the alteration of the tattoo did not violate due process. Thus, the decision of the Appellate Division with respect to the evidence concerning alteration of petitioner's tattoo was neither contrary to, nor an unreasonable application of, clearly established federal law.

## CONCLUSION

For the reasons set forth above, petitioner's application for a writ of habeas corpus is denied. Since petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).

**SO ORDERED.**

**/S/**
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
July 25, 2005